ESTATE OF CHARLES W. BRICKERT, DECEASED, GLADYS BRICKERT, ADMINISTRATRIX, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 74980. Filed October 19, 1961.

*Frank R. Reid, Jr., Esq.*, for the petitioner.
*Theodore W. Hirsh, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined a deficiency in estate tax in the amount of $12,997.31, which resulted from increasing the value of one piece of real estate by the amount of $6,163.88 and the disallowance of an amount of $45,000 claimed as deductions for claims against the estate. The petitioner concedes that the respondent correctly increased the value of the parcel of real estate by $6,163.88. The only remaining issue for decision relates to the $45,000 item. In the petition no claim is made that the $45,000 represented debts of the estate. Instead, it is alleged that the value of the property included in the gross estate should be decreased by the amount of $45,000 as representing the interest of some of the decedent's children in certain of the real estate resulting from their contributions to the purchase price thereof in that amount.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by this reference.

Charles W. Brickert died intestate on February 9, 1955, a resident of Oswego, Kendall County, Illinois. The estate was duly filed for probate in the County Court of Kendall County, and Gladys Brickert, daughter of the decedent, was appointed and duly qualified as the administratrix of the estate.

The petitioner's Federal estate tax return was filed with the district director of internal revenue, Chicago, Illinois, on April 16, 1956.

In addition to Gladys, the other surviving children of the decedent

were Fred, Robert, John, and Charles. These five children were the heirs at law of the decedent.

Prior to 1926 the decedent and his wife, Martha, began acquiring real property in the area surrounding Chicago, Illinois. Some of these properties were retained by them, but some were traded for other properties. In 1927 they acquired two pieces of real estate.

One of such properties acquired in 1927 was located in Argo and will be referred to as the Argo property. It was acquired in their joint names and consisted of a three-story building containing seven flats and a store.[1] The purchase price of this property was approximately $45,000 and was acquired in a trade, the purchasers giving two mortgages totaling $25,000. The decedent and his family lived in one of the flats, and income was derived from rentals of the remainder of the property. The amount of rental received in 1927 was about $160 per month, but the amount varied due to vacancies at times.

The other property acquired in 1927 was located in Oswego and will be referred to as the Oswego property.[2] It consisted of about 22 acres of land. It was acquired in the name of the decedent alone. The record does not show the purchase price of this property or the manner of payment of the purchase price.

Fred graduated from high school in 1928 at the age of about 18 and commenced working. He continued to live with his parents and took most of his meals there until he was married in 1945. During that period he turned over all of his earnings to his father except about $5 per week which he kept for spending money. His wages in 1928 were $18 a week from May to December. At that time his wages were increased to $23 a week and that continued for about 4 years, when he was paid $40 to $45 a week. That continued for about 4 years, at which time his salary was raised to about $55 a week and that continued for a few years, at which time his wages were increased to $60 or $65 a week.

Charles was about a year younger than Fred. He also lived with the family and received all or most of his meals there. He started to work in May 1930, and earned about $18 a week for 2 or 3 years. His earnings thereafter were about $40 per week until his entry into the Army in 1942. He also turned over his earnings to his parents. Charles died a few months before the hearing in the instant case.

---

[1] The testimony of the witnesses is contradictory and confusing. At times the three-story, seven flat, property is referred to by the witnesses as the Oswego property. However, from the estate tax return, item #1 of Schedule A, it seems clear that this property was located at Argo, and hence it will be referred to as the Argo property.

[2] The testimony of the witnesses with respect to this property is confusing. It appears that the witnesses sometimes refer to this as the Aurora property, but since it is described in the estate tax return, item #3, Schedule A, as being located in Oswego, it will be referred to as the Oswego property.

Gladys graduated from high school in 1930 and worked from that time until about 1940. She earned from $10 to $12 a week until about 1932 or 1933. At that time she began receiving about $15 to $20 a week and this continued until 1940. She also worked a while in 1942 and received from $25 to $28 a week. Gladys also lived with her parents and turned over her earnings to them.

There were three other Brickert children, Robert, John, and William, all of whom lived with their parents. William drowned in 1940 at the age of 13. Robert started high school in 1930 and graduated in 1936. He started working in 1936 and was married in 1939. During the period from 1936 to 1939, he turned over his earnings to his parents. John, the youngest of the surviving children, was born about 1923. During the 4 years he was in high school he worked after school hours and when he graduated in 1940 he took a regular job. He gave all his earnings to his mother until he entered the military service in January 1943.

Prior to 1927, the decedent worked as a carpenter and for a while in 1927 he operated a bakery shop, but thereafter he was not employed and earned no income.

None of the children ever paid their parents any amount specifically for board and lodging. The food, clothing, and other necessary expenses for the members of the family were paid for out of the money which was earned by the children and turned over to their parents and out of any income available from investments. The money available after payment of the family expenses was used to pay off mortgages on property which had been purchased or in the purchase of additional properties. After the purchases above referred to, no further properties were purchased until 1938. The spending of money for entertainment and automobiles and the like was discouraged by the decedent and his wife. The purchase of real estate was the common everyday talk in the household. Specific purchases were discussed with the children. The children would examine certain properties and express their opinions as to whether they should be purchased. The properties were purchased with small downpayments and monthly installments. None of the children knew how much of his earnings was applied toward the purchase of any particular property, and there was never any discussion as to how much would be paid by each child, except that in determining whether to buy property the family discussed the availability of the earnings of the children. There was never any decision that any particular child should have any specified interest in any particular property. Properties were always purchased in the name of the decedent or the decedent and his wife as a matter of course and there was never

any discussion about the manner of taking title. The children always assumed that title would be taken in the names of their parents.

From 1938 to 1944, the decedent and his wife made six purchases of real estate, taking title in their joint names. These properties, together with the dates of purchase, the cost where shown, and the value thereof as stated in the estate tax return are as follows:

| Name of property | Date of purchase | Cost | Value stated in estate tax return |
|---|---|---|---|
| Hadley | July 25, 1938 | $3, 180. 00 | $1, 890. 00 |
| Lake | Feb. 1, 1941 | | (¹) |
| Batavia | Sept. 8, 1941 | 4, 500. 00 | ² 12, 235. 00 |
| Montgomery | Nov. 5, 1941 | | 5, 430. 00 |
| Lake | Nov. 14, 1942 | | (¹) |
| Binder | Feb. 28, 1944 | (³) | 14, 811. 00 |
| Total | | | 34, 366. 00 |

¹ None.
² This is the property the value of which the petitioner agreed should be increased by $6,163.88, resulting in a correct valuation of $18,398.88.
³ There was a downpayment of $500 or $600 and the balance of the purchase price was paid in monthly installments.

There was a small house on each of two of these properties which was rented and produced some income. The Hadley property was used for growing crops such as beans and corn.

Occasionally the decedent and his wife sold properties. In connection therewith the children were consulted but did not sign any documents of sale or quitclaim deeds. The proceeds of such sales were used in purchasing other property.

The decedent's wife, Martha, died in 1945, at which time no member of the family raised any question as to the legal title to the property or who owned the property. Upon the decedent's death in 1955 the children by mutual agreement divided up the property among themselves. Fred took the Argo property, Gladys took the Oswego property, Charles took the Binder property, and Robert took the Batavia property. Upon the probate of the estate in the County Court of Kendall County, claims were made against the estate by Fred, Charles, and Gladys in the respective amounts of $20,000, $15,000, and $10,000, based upon the assertion that these amounts had been loaned to the decedent in his lifetime for the purchase of property. Gladys, the executrix, allowed these claims and, since there was no objection, the Probate Court approved her action. However, such court, in determining the State inheritance tax due, disallowed as deductions the amounts of the claims of Fred, Charles, and Gladys in the total amount of $45,000 because of insufficient proof that these had constituted loans to the decedent.

The Federal estate tax return filed on behalf of the estate of the decedent showed a gross estate in the amount of $151,633.31. This consisted of real estate valued at $99,505.60, stock and bonds in the amount

of $1,512.27, deposits in savings and loan associations in the amount of $7,713.78, a life insurance policy in the face amount of $5,475 (and dividend of $7.26), and deposits in savings and loan associations in joint account with Gladys (and in one case with Charles) in the total amount of $37,419.40. In such return deductions were claimed for expenses and debts in the amount of $51,751.90, which included the above claims of Fred, Charles, and Gladys in the total amount of $45,000 represented as having been loaned by them to the decedent in his lifetime.

The respondent in the notice of deficiency disallowed these claims of the children totaling $45,000 on the ground that they were not contracted, bona fide, for an adequate and full consideration in money or money's worth and hence did not constitute valid deductions under section 2053 of the Internal Revenue Code of 1954.

The earnings of Fred, Charles, and Gladys which were contributed to the decedent and his wife were not intended to be, and were not, for any distinct interest in or definite parts of any of the properties to which the decedent held legal title at the time of his death. The decedent was the owner of such properties.

OPINION.

As indicated, hereinabove, the petitioner does not now claim that there were deductible claims against the estate in the amount of $45,000. Instead, it contends that three of decedent's children, Fred, Charles, and Gladys, contributed the respective amounts of $20,000, $15,000, and $10,000 of the purchase price of five properties to which the decedent and his wife took title and which were included in the decedent's gross estate for estate tax purposes; that resulting trusts arose with respect to such properties in favor of the children in proportion to the shares of the purchase money advanced by them; and that $45,000 should therefore be eliminated from the gross estate of the decedent.[3] The properties referred to are those described as Argo, Batavia, Montgomery, Binder, and Hadley, which were included in the gross estate at a total valuation of $56,406, but which the petitioner now concedes had a value of $62,569.88.

All the real estate in question was located in Illinois and the property law of that State is applicable in determining what interest, if any, the children may have had in such property. *Lyeth* v. *Hoey*, 305 U.S. 188, and *Helvering* v. *Stuart*, 317 U.S. 154. A resulting trust arises by operation of law and is founded on the presumed intent of the parties ascertained from their acts and attendant facts and circumstances, and usually comes into existence where one person furnishes the consideration, or an aliquot part thereof, for the purchase

---

[3] Section 2033 of the Internal Revenue Code of 1954 provides for the inclusion in the gross estate of the value of all property to the extent of the interest therein of the decedent at the time of his death.

of property while the title is taken in the name of another. *Tilley* v. *Shippee*, 12 Ill. 2d 616, 147 N.E. 2d 347; *Hanley* v. *Hanley*, 14 Ill. 2d 566, 152 N.E. 2d 879; and *West* v. *Scott*, 6 Ill. 2d 167, 128 N.E. 2d 734. However, it is well established by decisions of the courts of Illinois that where several persons contribute to the purchase of real estate it is essential, in order to create a resulting trust, that it shall appear that the sums severally contributed were for some distinct interest or some definite part of the estate. *Kinsch* v. *Kinsch*, 348 Ill. 446, 181 N.E. 315; *Kedas* v. *Kedas*, 342 Ill. 630, 174 N.E. 894; *Brooks* v. *Gretz*, 323 Ill. 161, 153 N.E. 643; and *Reed* v. *Reed*, 135 Ill. 482, 25 N.E. 1095. In *Reed* v. *Reed*, *supra*, it was stated:

A trust will not result to one who pays a part only of the purchase money of land conveyed to another, unless it be some definite part of the whole consideration, as one-half, one-third, or the like; and the trust can only arise from the original transaction at the time it takes place, and at no other time. * * *

The cases of *Kedas* v. *Kedas*, *supra; Brooks* v. *Gretz*, *supra;* and *Kinsch* v. *Kinsch*, *supra*, all involved children's contributions to common family funds which were alleged to have been used by parents to purchase properties, but it was held in those cases that there were no resulting trusts since it was not shown that any definite part of the purchase price of any particular property was furnished by the children or that they received any distinct interest in the property. While it may not be necessary to show the precise amount of the contribution of each (see *Merschat* v. *Merschat*, 1 Ill. App. 2d 429, 117 N.E. 2d 868), there must be evidence of an intent that the contributor should take some specific interest in the property.

In the instant case the evidence does not show any definite part of the purchase price of any of the properties which was furnished by any one or all of the children. Each of the children who testified stated that none of them knew how much of his earnings was invested in any particular property. The purchase prices of some of the properties are not shown. The children did contribute substantially all their earnings to their parents, and from these funds and from income from investments of the parents, the parents paid the family expenses, paid off the mortgage on the Argo property, and paid for the other properties purchased from 1938 to 1944. The children testified that there was never any question that title was to be taken in the names of their father and mother. While they testified to the effect that title was so taken for convenience in that it was the simplest way to handle the matter, the conclusion is inescapable from a consideration of the record as a whole that there was no intention that the children, or any one of them, should take any specific interest in any particular property. It may be added that while Fred testified that the $25,000 mortgage indebtedness on the Argo property was paid largely from his earnings, that property had been purchased by

his parents before he started to work and he furnished no part of the purchase price at the time of such purchase. From a consideration of the whole record, we think it must be concluded that, in turning over their earnings to their parents, the intention of the children was to permit their parents to do with the funds as the parents should determine. It is true that the children were consulted with respect to purchases of property and that in a general sense the purchases were a family project, but the fact remains that there is no evidence to show an intention that the children, or any one of them, should have any specific interest in the properties during the lifetimes of their parents. Rather, it seems to us that the children were satisfied to permit their parents to have the full interest in the property during the parents' lifetimes and to wait until the death of their parents to receive any interest in any of the particular properties. This was, indeed, what actually happened. When the mother died in 1945, no question was raised about any interest of the children in the property. Furthermore, in the Probate Court no claim was made of any specific interest in any particular property by any of the children. Instead, three of the children made claims against the estate on the ground that money had been loaned to their father during his lifetime. We think these facts are corroborative of our conclusion that there was no intention that during the lifetimes of the parents the children should have any interest in the properties.

Since the petitioner has not shown that there were any resulting trusts in favor of the children with respect to any of the properties which were included in the decedent's gross estate, the respondent's determination is approved.

*Decision will be entered for the respondent.*